Filed 2/2/15  P. v. Howard CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMES W. HOWARD,<br><br>    Defendant and Appellant. | B253031<br><br>(Los Angeles County<br>Super. Ct. No. LA070782) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph A. Brandolino, Judge.  Reversed.

David Andreasen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General and Ana R. Duarte, Deputy Attorney General, for Plaintiff and Respondent.

Defendant and appellant James Howard appeals from the judgment after a jury trial in which he was convicted of the premeditated murder (Pen. Code, § 187, subd. (a)) of his girlfriend, Sharilit Matthews. Defendant contends: (1) the prosecutor committed misconduct in argument to the jury by misstating the mental state necessary for voluntary manslaughter; (2) numerous pieces of evidence should have been excluded as more prejudicial than probative; (3) the evidence of premeditation and deliberation is insufficient to support the verdict; (4) the standard jury instruction for voluntary manslaughter improperly allocates the burden of proof; and (5) evidence of prior acts of domestic violence should have been excluded. We conclude that the prosecutor's argument was misleading, some highly prejudicial evidence was improperly admitted, and that the cumulative effect of these errors was prejudicial. We therefore reverse for a new trial.

## PROCEDURAL BACKGROUND

Defendant was charged by information with one count of murder. It was further alleged that he used a deadly weapon in the commission of the murder (Pen. Code, § 12022, subd. (b)(1)). It was also alleged that defendant had suffered a single prior serious or violent felony conviction, within the meaning of Penal Code sections 1170.12 and 667, subdivision (a)(1). Additionally, it was alleged that he suffered a prior prison term within the meaning of Penal Code section 667.5, subdivision (b).

Defendant entered a not guilty plea and the case proceeded to jury trial. At defendant's request, the trial court bifurcated the trial on defendant's prior conviction allegations. Prior to trial, the prosecution submitted a trial brief[1] setting forth anticipated testimony and evidence. Based on this trial brief, defendant interposed numerous objections which the trial court resolved out of the presence of the jury.

During opening statements, defense counsel conceded that defendant killed Matthews. Defense counsel argued, however, that the killing occurred during the heat of passion, and was therefore only voluntary manslaughter.

---

[1] The trial brief is not part of the record on appeal. Defendant requested its inclusion, but the clerk found no such document in the trial court file.

The evidence was presented over ten days. At the close of the prosecution's case, defendant moved for acquittal under Penal Code section 1118.1, which motion was denied. Defendant put on his case, and the matter was submitted to the jury. After just over five hours of deliberation, the jury concluded defendant was guilty of first degree murder. The deadly weapon allegation was found to be true. Defendant subsequently waived trial on the prior conviction allegations and admitted them. He was sentenced to a term of 25 years to life in prison, doubled (pursuant to Penal Code section 1170.12) plus one year for the dangerous weapon, plus an additional five years (pursuant to Penal Code section 667, subdivision (a)), for a total term of 56 years to life in prison. Defendant filed a timely notice of appeal.

### FACTS

Defendant lived with Matthews for just under six months. He had moved into her apartment when he was released from prison, on parole, for a prior robbery conviction. Defendant was approximately 20 years younger than Matthews. By all accounts, the relationship was tumultuous. Defendant had other women over to Matthews's apartment while Matthews was at work. Defendant was unfaithful. Defendant and Matthews frequently argued; the arguments would get physical.

Defendant killed Matthews some time after she came home from work on February 2, 2012. He slashed her throat with a knife; the autopsy revealed a single wound to Matthews's neck from one side to the other. After the killing, defendant did not seek help for Matthews, although she may have struggled for breath for some time. Instead, defendant left Matthews's body on her bed, in the apartment, while he sold and pawned her possessions for money to buy marijuana. He stayed with friends and went to at least one party. Matthews's decomposing body was ultimately discovered eight days later, when her concerned friends and family asked the police to check on her welfare.

Defendant testified that he killed Matthews in the heat of passion when, during an argument, Matthews told defendant she had aborted their baby. The evidence at trial established that Matthews and defendant had both told friends and family that Matthews

3

was pregnant with defendant's child. The autopsy revealed that Matthews had not had an abortion, nor had she been pregnant at the time of her death. Indeed, she had likely menstruated approximately three weeks before she was killed.

1.    *Nature of the Relationship*

The prosecutor introduced substantial evidence of the nature of the relationship between defendant and Matthews. The evidence painted the following picture. Matthews worked at a grocery store deli counter; she was on her feet all day. Matthews provided for defendant and paid his phone bill. Defendant, in contrast, spent his days in the apartment, hanging out with his friends and smoking marijuana. Defendant smoked marijuana frequently. Defendant did not treat Matthews well. Despite the fact that she worked and he did not, he was not considerate toward her. Instead, when she came home from work, he would demand that she cook for him or get him liquor or marijuana. Matthews's family members did not like defendant; they did not like the way he treated Matthews. Defendant was unfaithful to Matthews with several other women. He exchanged sexual text messages with other women[2] and a man who identified as transsexual.

2.    *Prior Domestic Violence*

Defendant and Matthews frequently argued. Neighbors would often complain to the apartment manager about their loud arguments. Neighbors heard defendant cursing at Matthews and Matthews crying during the fights. During one fight, Matthews was heard desperately telling defendant " 'take your money and leave.' " Neighbors also heard noises which sounded like struggles and heavy objects falling during the fights.

At one point, on October 25, 2011, a neighbor called the police because of one of the fights. When the police arrived, Matthews appeared to have some fresh red scratch marks on her face, as if fingernails had been pulled over her skin. She was crying and upset. However, she told police that she had been in a fight with a female friend. No arrests were made. Defendant told a friend that Matthews was "a solid bitch," and

---

[2]    Defendant sent his text messages in all capital letters. When we quote the messages, we use lower case.

bragged that she did not tell the police on him. Defendant told that same friend that he should sharpen two of his fingernails to a point, as defendant had, and that " 'next time your bitch get out of line, you grab over and you reach around her neck and grab a bitch by her neck, and that will make her sit down and she's bound to stop.' " There was at least one other instance when Matthews was seen with bruises and other injuries, for which she offered a questionable explanation.

3.     *The Killing*

Little is known about the events leading up to defendant's killing of Matthews. The advanced state of decomposition of Matthews's body limited the usefulness of physical evidence. Based on the security camera feed in the parking lot at Matthews's building, and defendant's cell phone records, it appears that the killing took place between Matthews's return from work at 5:21 p.m., and defendant's phone calls at 7:11 p.m.

Matthews was eventually found on her bed, and there is no evidence that she had been killed elsewhere and moved. She was killed by a 4 1/2 inch horizontal wound across her neck, some 3 1/4 inches below her chin. The cut was in the folds of Matthews's neck; the officers who discovered her body did not initially see that her throat had been slashed. The cut was made with a sharp instrument, like a knife. The depth of the wound varied from 1/8 to 1/2 of an inch. Beneath the skin, it cut several muscles and the cartilage of Matthews's trachea. Indeed, the cut went all the way through the wall of trachea cartilage from front to back. The deputy medical examiner testified that a certain amount of strength is necessary to cut through the cartilage of the trachea, similar to the strength used in cutting a drumstick from a chicken thigh. The deputy medical examiner did not testify, however, as to if the trachea damage could have been made by a single slicing blow across the victim's throat, or if, to the contrary, cutting the trachea would have required stopping mid-strike and applying additional force. The direction of the wound could not be determined.

Matthews was alive when her throat was cut. The wound would have caused problems in breathing as blood entered the trachea. While it was possible that

5

Matthews could have died very quickly from spasms, she might have gagged and struggled for additional time, ranging from a few minutes to an hour. Alternatively, she might have been unconscious.

No additional wounds were found on Matthews's body, although small bruises might have been obscured by the body's decomposition. DNA swabs from clippings taken from Matthews's nails matched defendant's DNA. When defendant was arrested on February 11, 2012, he had no injuries on his face or chest area. There was a slight red scratch above the knuckle on his left forearm, and a circular scratch below his left knuckle. Defendant ultimately testified that one of these scratches was from the fight with Matthews, but the other was not.

4.    *Defendant's Testimony*

Although defendant had been interviewed by police, he did not admit to killing Matthews until trial. At trial, for the first time, defendant admitted the killing and claimed it had occurred during the heat of passion. Defendant testified to the following course of events. By November of 2011, he and Matthews were arguing regularly, and he had considered leaving her. He did not leave, however, because, in late November, Matthews told him that she was pregnant. They were both excited about the pregnancy. On February 2, 2012, when Matthews came home from work, she went straight to the bedroom. Defendant was in the kitchen washing dishes. Matthews came out of the bedroom and started questioning defendant about a woman he had over at the apartment that day. An argument ensued and intensified. Defendant decided to get out of the situation; he went to the bedroom to pack up his belongings. He did not know if he was leaving temporarily or permanently at this time. Matthews returned to the bedroom and asked defendant what he was doing. When defendant responded that he was leaving, Matthews told him that he was not going anywhere. The argument continued. Matthews had a knife in her hand. Defendant asked her what she was doing and took the knife from her hand. When he took the knife from her, Matthews fell back on the bed. They continued to argue, and defendant told Matthews to calm down and think about the baby. Matthews replied that there was no more baby. Defendant asked what

6

she meant, and Matthews said that she had killed his child and had an abortion. Defendant felt angry, upset and sad. He used the knife and cut Matthews's throat with a single cut. He was upset and confused. Everything was blurry. Matthews was gasping for air, trying to breathe. Defendant did not try to help her; all that he could think to do was leave.

5.    *Events After the Killing*

Although defendant's account of the killing itself differed from the view of the prosecution, there was little dispute regarding defendant's actions after the killing. Defendant contacted friends to try to find a place to stay for the night. His text message records indicate an attempt to arrange something more long-term.[3]

That night, defendant stayed with friends. Defendant drove Matthews's car to his friends' house. He told his friends that he had argued with Matthews because he had caught her cheating. He said that he had beaten up the other man, slapped Matthews, and left. That night, defendant stayed with his friends, watching TV and smoking marijuana. The next day, defendant went to a party with his friends.

Over the next week, defendant returned to the apartment several times. Each time, he picked up some of Matthews's belongings and pawned or sold them. On February 3, 2012, defendant pawned Matthews's home theatre system and her laptop computer. Later, he sold Matthews's television set for an ounce of marijuana. He also planned to trade in Matthews's car and get another one.

He texted a friend, Krystal Zepeda, that they had to talk because he "did some shit." Defendant told Zepeda that Matthews had been murdered, although he said that he did not do it. However, before defendant was arrested, he told Zepeda that Matthews had undergone an abortion and that he was mad, sad, and shocked about it. Text messages with another friend, Kristine Sanchez, on February 5, 2012, are to the same

---

[3]      Specifically, defendant had previously texted a woman named Renee Robbie about coming to live with her. After he killed Matthews, defendant texted Robbie, asking her how she would feel if he came out to see her in two days. When Robbie said that she wanted him to stay with her forever, defendant responded that he was "willing to make that move right now."

7

effect. Defendant told Sanchez that he had to leave Matthews because "she was on some bullshit" and he did not have time for that. Sanchez responded that defendant would have to deal with Matthews because she was pregnant with his baby. Defendant responded, "She killed my baby . . . I ain't never dealing wit[h] that bitch again."[4]

6.     *The Discovery of the Body and Defendant's Arrest*

Matthews had previously dated Victor Johnson. Although they were no longer in a relationship, Matthews had considered Johnson's 10-year-old child as her stepson. She helped Johnson raise the boy. When Matthews failed to return Johnson's calls and texts in early February, he became concerned. He spoke to Matthews's relatives, who had also been unable to contact Matthews. Finally, on February 10, 2012, Johnson called police to check on Matthews's welfare. He met police at Matthews's apartment, and gave them his key to her apartment. Matthews's decomposing body was discovered.

Police investigated and ultimately suspected defendant of the crime.[5] When he was interviewed by police, he admittedly lied to the officers about nearly everything. He lied about killing Matthews, lied about when he last saw her, lied about taking her TV, and lied about driving her car. He told police that, when Matthews had come home, she was angry because he had invited a woman over while she was at work, and she told him to leave. He specifically told police that Matthews would never have an abortion, and that, if she had had one, he would have left her. Defendant admitted that he had previously bitten Matthews in anger, telling police, " 'I'll bite the shit out of her. She'll talk shit to me, and I would bite her, and it would leave a mark sometimes.' "

---

**4**     This was not the only explanation for leaving Matthews which defendant offered in text messages. He texted someone else that he left Matthews because she's "just a fucking dirty bitch."

**5**     As defendant testified that he killed Matthews, we do not discuss the evidence connecting him to the offense. Nonetheless, the prosecution introduced incontrovertible evidence establishing that defendant was the killer, including cellular telephone tracking data.

8

Police had discovered a steak knife in the kitchen sink of Matthews's apartment. Defendant testified that this was the knife he had used to kill Matthews. At trial, however, the prosecution introduced rebuttal evidence to cast doubt on this testimony. Specifically, a criminalist had tested the knife, and it was negative for blood.

## CONTENTIONS ON APPEAL

On appeal, defendant contends: (1) the prosecutor committed misconduct in argument to the jury by misstating the mental state necessary for voluntary manslaughter; (2) numerous pieces of evidence should have been excluded as more prejudicial than probative; (3) the evidence of premeditation and deliberation is insufficient to support the verdict; (4) the standard jury instruction for voluntary manslaughter improperly allocates the burden of proof; and (5) evidence of prior acts of domestic violence should have been excluded. We conclude that the prosecutor misstated the mental state necessary for voluntary manslaughter, and that some of the prosecution's evidence should have been excluded as more prejudicial than probative. We also conclude that there is sufficient evidence of premeditation and deliberation to establish first degree murder. We therefore reverse the judgment of conviction for a new trial on all counts, without reaching defendant's other contentions.

## DISCUSSION

1. *Prosecutorial Misconduct/Ineffective Assistance of Counsel*

Defendant contends the prosecutor committed misconduct in argument to the jury. Specifically, defendant contends that the prosecutor misstated the mental state necessary for heat of passion voluntary manslaughter.

"Manslaughter is a lesser included offense of murder. [Citations.] The mens rea element required for murder is a state of mind constituting either express or implied malice. A person who kills without malice does not commit murder. Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and

9

without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.]  Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation.  While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*People v. Beltran* (2013) 56 Cal.4th 935, 942, fn. omitted.)

"Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing.  The proper focus is placed on the defendant's state of mind, not on his particular act.  To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react,* without reflection."  (*People v. Beltran, supra,* 56 Cal.4th at p. 949.)  "Framed another way, provocation is not evaluated by whether the average person would *act* in a certain way: to kill.  Instead, the question is whether the average person would *react* in a certain way:  with his reason and judgment obscured."  (*Ibid.*)  This is not a new standard.  It is well-established that the issue raised by a claim of heat of passion is *not* whether a reasonable person would have *done* what the defendant *did* (kill), but rather, if a reasonable person would have been *provoked to act rashly*.  (*People v. Najera* (2006) 138 Cal.App.4th 212, 223.)

In this case, in argument to the jury, the prosecutor focused on the issue of whether a reasonable person *would kill* in response to the purported provocation of an abortion.  The prosecutor argued, "Would the average person kill a person because she says, 'I'm not pregnant.  I killed your baby.  I aborted your baby.  I terminated it. I terminated your baby.[']  So I terminate you?[]  The average person would not think like that."  This was not an isolated remark.  The prosecutor continued, "I submit to you it's not sufficient provocation.  You can't say, 'You had an abortion, so I'm going to kill you.' "  The prosecutor repeated, "if a person tells you, 'I had an abortion,' that is not sufficient for you to kill them."  She repeatedly returned to the theme, saying again, "Because she said she had an abortion is not sufficient provocation to kill her."  She

repeated, "So when defendant says he's provoked by she told him there's no more baby, she had had an abortion, would a person of average disposition who was told there was no more baby cut a person's throat?  No."  At the end of her argument, when asking the jury to find defendant guilty of first degree murder, the prosecutor again emphasized, "A reasonable person such as yourself would not find that it's okay to kill somebody because they say they had an abortion."  After defense counsel argued, the prosecutor returned to the theme in her rebuttal argument, ending her argument with, "This is not a voluntary manslaughter.  There is no heat of passion.  There is no provocation.  If you thought for an instant this was provocation, you have to consider, 'would a reasonable person, not the defendant, but a reasonable person do the same thing under the same circumstances?[']  And I submit to you, you will not find that that's reasonable.  [¶] And I will ask that you find this defendant guilty of first degree murder."

Not only did the prosecutor focus on the issue of whether the provocation was sufficient to make a reasonable person *kill* in her oral argument to the jury, the same mistaken focus was present in some of the prosecutor's PowerPoint slides used in connection with the argument.  The "Voluntary Manslaughter" slide  states, in underlined text:  "Reasonable person would do the same in the same circumstances."  A later slide notes that the defense argument is that defendant was provoked by being told by Matthews that she had an abortion.  Underneath that statement, the text reads: "Would a person of average disposition who was told there was no more baby, cut a person's throat."  Superimposed on that question is a large red circle with a line through it, demonstrating that the prosecution believes that the test is not met, and that, therefore, the killing was not voluntary manslaughter.

To be sure, at times in both the prosecutor's argument to the jury and the PowerPoint slides, the prosecutor set forth the proper test, whether a reasonable person

would *act rashly* under the provocation. But the prosecutor's juxtaposition of both standards was meant to give the impression that they were, in fact, the same.[6]

On appeal, defendant contends that the prosecutor's argument constituted prosecutorial misconduct. The prosecution does not attempt to argue that the prosecutor correctly set forth the law of voluntary manslaughter; it is very clear that the prosecutor's focus on whether the provocation was sufficient to provoke a reasonable person to *kill* (rather than to *act rashly*) was a significant misstatement of the law.

However, defendant did not object to any of these misstatements. "To preserve for appeal a claim of prosecutorial misconduct, the defendant must make a timely objection at trial and request an admonition to the jury. [Citation.] A defendant is excused from the necessity of objecting and requesting an admonition if either would have been futile. [Citations.]" (*People v. Najera, supra,* 138 Cal.App.4th at p. 224.) Here, defendant does not suggest that an objection would have been futile. Indeed, it would not have been. Defense counsel interposed several objections to other portions of the prosecutor's argument, and, when the objection was that the prosecutor was misstating the law, the trial court appropriately admonished the jury that the court's instructions, not counsel's statements, set forth the law.

Defendant therefore argues that his trial counsel was ineffective for failing to object. "To prevail on a claim of ineffective assistance of counsel, the defendant must prove: (1) his or her attorney's representation was deficient in that it fell below an objective standard of reasonableness under prevailing professional standards; and (2) his or her attorney's deficient representation subjected him or her to prejudice. [Citations.] Prejudice means a 'reasonable probability that, but for counsel's unprofessional errors,

---

[6]     For example, the prosecutor argued: "Again, the provocation would have caused a person of average disposition to act rashly: the average person is all of you. Would the average person kill a person because she says, 'I'm not pregnant. I killed your baby. I aborted your baby. I terminated it. I terminated your baby.['] So I terminate you?[] The average person would not think like that. The average person is all of you. You have to think, [']well, was that sufficient provocation for this to be a heat of passion, to go to voluntary manslaughter?['] And I submit to you it's not sufficient provocation. You can't say, 'You had an abortion, so I'm going to kill you.' "

12

the result of the proceeding would have been different.' [Citation.] A reasonable probability means a 'probability sufficient to undermine confidence in the outcome.' [Citation.]" (*People v. Najera, supra,* 138 Cal.App.4th at p. 225.)

In most cases, the failure to object does not constitute ineffective assistance of counsel. "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Maury* (2003) 30 Cal.4th 342, 419.) However, deference to defense counsel "must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions." (*People v. Ledesma* (1987) 43 Cal.3d 171, 217.) In this case, we are at a loss to conceive of any sort of tactical reason defense counsel may have had for failing to object to the prosecutor's repeated oral and written misstatements of the standard for provocation necessary for voluntary manslaughter. In defense counsel's opening statement to the jury, counsel conceded that defendant had killed Matthews; defendant's sole theory of defense was that the killing was provoked. The prosecutor's argument set up an impossible standard, that a reasonable person would have been *provoked to kill*, rather than the actual standard, that a reasonable person would have been *provoked to act rashly*. If the jury accepted the prosecutor's interpretation of the voluntary manslaughter standard, a murder conviction was guaranteed. At oral argument on appeal, the prosecutor argued that defense counsel may have made the tactical decision not to object in order to demonstrate to the jury that the defense had so much confidence in its case that it believed the voluntary manslaughter defense would survive even the prosecutor's higher standard. Such a decision, if made, would constitute ineffective assistance of counsel. As our Supreme Court has made clear, "society expects the average person not to kill, even when provoked." (*People v. Beltran, supra,* 56 Cal.4th at p. 949.) "[W]e punish a person who kills in the heat of passion or upon provocation because '[h]e did not control himself as much as he *should* have, or as much as common experience tells us he *could* have, nor as much as the ordinarily law-abiding person *would* have.' [Citation.] However, if one *does* kill in this state, his punishment is mitigated. Such a killing is not justified but *understandable* in

13

light of 'the frailty of human nature.' [Citation.] The killing reaction therefore is the *extraordinary* reaction, the unusual exception to the general expectation that the ordinary person will not kill even when provoked." (*Ibid.*) In other words, *no reasonable person kills* in response to provocation. If the standard were as the prosecution stated it, the standard *could not be met*, as a matter of law.

Not only did defense counsel not object to the prosecutor's clear misstatement of the law, defense counsel did not address and correct this misstatement in her own argument to the jury. We are left with the unfortunate conclusion that defense counsel failed to object not out of any tactical reason, but because she, too, misunderstood the applicable standard established by governing law.[7]

We next ask whether, in the absence of counsel's failure to object, there is a reasonable probability that the result would have been different. We conclude that this is not a case in which any jury misunderstanding would have been cured by the fact that the trial court instructed the jury on the proper test for heat of passion voluntary manslaughter (CALCRIM No. 570) and gave the standard instruction that the jury must follow the law as explained by the court, not the arguments of counsel (CALCRIM No. 200). The latter instruction provides, "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." In other words, the jury would not disregard the comments of the prosecutor unless it first believed that the prosecutor's comments conflicted with the court's instructions. But the prosecutor here phrased her comments in such a way as to give the impression that she was simply offering a consistent interpretation of the instruction, and neither defense counsel nor the court gave the jury any reason to even consider the possibility that the prosecutor was misstating the law. It is not reasonably probable that a jury, untrained in the law,

---

[7] The Supreme Court's opinion in *People v. Beltran* was issued on June 3, 2013, nearly two months before the trial in this case began. In any event, the Supreme Court in *Beltran* simply "reaffirm[ed] the standard for determining heat of passion that [it] adopted nearly a century ago." (*People v. Beltran, supra,* 56 Cal.4th at p. 957.)

14

would *independently* recognize the difference between the jury instruction's language and the prosecutor's argument purporting to interpret it, and therefore disregard the latter. (See *People v. Beltran, supra,* 56 Cal.4th at p. 952 & fn. 10 [collecting cases which erroneously used language suggesting the two standards were the same].)

Nor do we conclude the evidence of murder was so overwhelming, it was not reasonably probable that the erroneous argument contributed to the verdict. While there was certainly evidence to support a verdict of murder, there was also evidence from which a verdict of voluntary manslaughter could have been reached. Defendant testified that he was provoked into acting with his reason and judgment obscured because Matthews, during the course of an argument, told him she had aborted their baby. That this would provoke a reasonable person to act rashly is not outside the realm of possibility. (Cf. *People v. Beltran, supra,* 56 Cal.4th at p. 941.) Moreover, there is some evidence which confirms defendant's story. It is undisputed that Matthews had told her friends and relatives that she was pregnant. However, the medical evidence indicates that Matthews had menstruated at least three weeks before she was killed. Further, there is evidence that defendant still believed Matthews was pregnant up until the killing. On the night of January 31, defendant texted a friend, "Im [a]bout to holla at my girl cause she have'n that prego shit right now." Certainly, the prosecution never suggested that defendant *knew*, two days before the killing, that Matthews was not pregnant, but texted a friend about it in order to create a paper trail to support his planned voluntary manslaughter defense. After the killing, but before defendant's arrest, he told multiple friends that Matthews had killed their baby – this evidence establishes that defendant's claim that Matthews told him she had an abortion is not a recent fabrication. While it is possible that the jury rejected the defendant's testimony that he was, in fact, provoked by this statement, it is also reasonably probable that the jury concluded – based on the prosecutor's argument – that the purported provocation was simply inadequate because it would not have provoked a reasonable person to kill. This is sufficient to undermine our confidence in the outcome of this trial.

15

2.    *Highly Prejudicial Evidence Was Admitted*

Defendant contends that the trial court abused its discretion in admitting a great deal of highly prejudicial evidence with limited or no probative value. Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." A trial court's determination under this statute will not be disturbed on appeal absent a clear showing of abuse of discretion. (*People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1610.) " 'Evidence is prejudicial within the meaning of Evidence Code section 352 if it " 'uniquely tends to evoke an emotional bias against a party as an individual' " [citation] or if it would cause the jury to " ' "prejudg[e]" a person or cause on the basis of extraneous factors' " [citation].' [Citation.]" (*People v. Foster* (2010) 50 Cal.4th 1301, 1331.)

In this case, the evidence the admission of which most clearly violated Evidence Code section 352 was the evidence related to Regina, a transsexual man with whom defendant exchanged text messages. In the pretrial hearing, the prosecutor volunteered that she did not seek to admit defendant's text messages about sex with men, because those texts were irrelevant. By the end of the trial, however, the prosecutor sought to admit all of defendant's text messages with Regina. Defense counsel strenuously objected, but the trial court admitted the messages as more probative than prejudicial.

We set forth some of the text messages, all of which were admitted into evidence, in order to illustrate the level of detail addressed. On January 26, 2012, Regina expressed an interest in "tasting and feeling dat tight ass." Regina said, "Im charging," and quickly added, "I wasnt talking bout cash." Defendant asked, "So who is u charging???" Regina responded, "When I give u the info u got 2 let me beat dat ass up." Defendant asked, "U want to [fuck] me???U know I aint never went down that road Lil Mama . . . I always am the one beating it up." After a few minutes of no reply, defendant asked Regina, "Well am I getting to digg in U???" Shortly thereafter, Regina

16

asked defendant, "How big is ya dick." Defendant replied, "8 strong." Regina asked if that meant "u can hang 4 awhile???" Defendant responded, "For a long ass while."[8]

On January 29, 2012, defendant exchanged sexual text messages with Regina while simultaneously flirting (by text) with Renee Robbie. At this time, Defendant's texts with Regina included defendant stating, "I would love to see yo sexy ass lips rap'd around my dick," and Regina responding, "Cant wait 2 fuck dat throat." Defendant asked, "So u gonna suck my dick whenever we get to that level," and Regina responded, "Sure right after u bounce that tight ass up & down dis dick." Defendant then volunteered, "I will be way more willing to suck ur dick then to get fucked . . . U ever thought about trying 69???"

On February 1, 2012, Regina texted defendant, "I wish u was smoking on this phat dick." Defendant responded, "Is that right . . . well Im tryna get that too."

On February 8, 2012, several days after he had killed Matthews, defendant texted Regina, asking, "What would u say to a 3Way . . . me u and some one else???" Regina replied, "Me u & ya homie?" and added, "The more dick going in ya tight ass th[e] better." Defendant explained, "Naw not my homie . . . Im just saying . . . U fuck the other person while I fuck the shit out of u." The two appeared to argue, and defendant explained, "Im keeping it real . . . U tryna fuck something and I am too . . . so we can make that happen." When Regina said "Im telling u when we meet Im fucking u anyway," defendant responded, "Wow first off Ima tell u that u or no one else on the

_____

[8] Regina was not the only male with whom defendant exchanged sexually explicit text messages. Later that evening, defendant texted an unknown individual about "linking up," saying, "And if I do come Ima be doing the fucking this time . . . r u good wit that???" The other individual responded, "You have a big ass dick im scared [laughing out loud]." Defendant replied, "I can work it slow ma . . . dont trip . . . but I am tryna have u feel me inside u . . . I really want to digg u but like I said Ima work it slow so it feels good." The other person responded, "That's fine babe as long as you give me some of your hole too." Defendant responded, "Really to tell the truth I wasn't tryna do that again so soon . . . I was gonna suck u up and lick you balls and ass . . . Im tryna take it slow wit the hole . . . u feel me." As the conversation continued, the other man asked defendant for "a pic of your butt and your cock please." Defendant responded, "I will do it tommrow cause Im with the fam right now."

fucking earth is gonna tell me how shits gonna go . . . U think u just gonna ram me???
[Laughing my mother-fucking ass off] . . . U need to stop." The conversation
continued, with Regina saying, "I aint gonna ram Im gonna start slow after I eat dat
tight ass" and defendant adamantly stating, "Not the first time we meet u aint . . . aint no
back action when we meet." The discussion continued in this vein, until Regina agreed,
adding, "I hope ya ass don't mind me playing wit that tight juicy ass while we 69," and
defendant being open to the possibility.

On appeal, defendant argues that the rather detailed sex messages with Regina
were highly prejudicial, and not probative of anything. The prosecutor responds that
this was simply evidence of defendant's "infidelity," and undermined defendant's
assertion that he was a happy expectant father. That defendant was unfaithful with
multiple women was undisputed. That he planned to be unfaithful with a man that
identified as transsexual added nothing.[9] The particular details of planned mutual
fellatio, the possible involvement of a third person, and defendant's thoughts on the
relative merits of giving and receiving anal penetration are relevant to no issues in this
case. Moreover, the evidence is clearly prejudicial and likely to evoke an emotional
bias against defendant. At a minimum, the cumulative evidence of defendant's graphic
sexual exploits or desires took the jury's focus away from the question of what
happened and put it squarely on defendant's character. The court abused its discretion
in admitting the details of the text messages with Regina.

While the content of defendant's text messages with Regina was the most
prejudicial of all of the challenged evidence admitted, it is not the only evidence
improperly admitted against defendant. The court admitted into evidence a letter
defendant had written to his brother. The letter includes a reference to the defendant's

---

[9]     This is not to say that there is no probative value to any of defendant's text
messages. Indeed, perhaps the most relevant inferences one can make from the dozens
of pages of defendant's text messages admitted into evidence are that he rarely
mentioned Matthews, and he clearly did not behave as though he was in a committed
long-term relationship with her. Properly sanitized, some of defendant's text messages
may thus be admissible on retrial.

plan to "mind fuck [a] bitch out of all her [money]." It is apparent from the text of the letter, which refers to the woman in question as someone who works "at a weed shop," that this reference is to another woman, not Matthews. Nonetheless, the trial court admitted the letter, over objection, as highly relevant to defendant's state of mind at the time of the killing.[10]

Evidence Code section 1101, subdivision (a), prohibits, with certain exceptions, "evidence of a person's character or a trait of his or her character . . . when offered to prove his or her conduct on a specified occasion." On appeal, the prosecutor argues that the letter was relevant because it demonstrates that defendant "used women for money, and showed his views on women, including the victim." The letter, as previously noted, does not discuss Matthews,[11] and therefore does not address his views toward her. Instead, the letter demonstrates that defendant "used women for money," which is simply a character trait. The prosecution sought to have the jury infer that defendant used *Matthews* for money because he had discussed using another woman for money. In other words, this evidence was intended to support a jury inference that defendant's character was to use women, and that he acted in accordance with this character in his relationship with Matthews. This is improper character evidence which should have been excluded under Evidence Code section 1101, subdivision (a). To the extent the letter was admitted to show defendant's state of mind at the time of the killing, which was at issue, it was weak evidence indeed. The theory of admission was that, since defendant talked about "mind fuck[ing] [a] bitch out of all her [money]," defendant was

---

[10]    The letter also includes references to defendant's tattoos, which may be gang related. In the letter defendant states, "[A]y bro I got the face tatted. [O]n one side of my face I got valley going down the hair line. [A]nd on the other side I got badmon. [A] badmon Is that one crazy nigga in the hood nobody fucks wit cause he fucked up in the head. [T]hat's my new rap shit. [T]he valley badmon possie."

[11]    The letter *may* mention Matthews at another point. Defendant states, "I with my other female the black girl in the flix I showed u.I will send u flix of her tho bro so don't trip." The prosecution did not focus attention on this language, and the trial court's finding of relevance was not related to it.

19

not the sort of individual who would be so concerned about the fetus his girlfriend was carrying that he would lose rational judgment when told she aborted it.  To state this theory of relevance is to demonstrate how tenuous it is.[12]  A defendant's thoughts about using one woman for money bear no relationship to his thoughts about his potential child another woman may be carrying.  Any minimal probative value of the evidence is vastly outweighed by the nature of undue prejudice, in that the jury is likely to have a negative emotional reaction toward a defendant who discusses women in such a cavalier manner.  The trial court therefore abused its discretion in admitting this letter.

3. *Cumulative Error*

Considering the effect of the errors together, we are convinced that the cumulative error requires reversal.  Absent defense counsel's failure to object to, and seek correction of, the prosecutor's repeated misstatements of the voluntary manslaughter standard and the trial court's erroneous admission of highly prejudicial evidence with minimal or no probative value, it is reasonably probable that the result would have been different.  (*People v. Cardenas* (1982) 31 Cal.3d 897, 907.)  The jury's deliberations were quick in comparison to the length of the trial.  There was sufficient evidence to support a possible voluntary manslaughter conviction.  It is reasonably probable that, in light of the highly prejudicial evidence wrongfully admitted, and the prosecutor's uncorrected multiple misstatements of the key voluntary manslaughter standard, that the jury simply convicted defendant as charged, without considering the relevant evidence and the proper standard.  We therefore reverse for a new trial.

4. *Sufficient Evidence of Premeditation and Deliberation*

Although the above errors warrant reversal, "it is necessary to reach defendant's alternative argument pertaining to the sufficiency of the evidence since the absence of sufficient evidence would preclude retrial. [Citations.]  When reviewing the evidence

---

[12]     If the prosecution sought to admit the document to show that, since defendant wanted to "mind fuck" one particular woman out of all her money, he must have intended to murder Matthews and take her money, the connection is equally tenuous.

for purposes of deciding whether retrial is permissible, we consider all of the evidence presented at trial. [Citation.]" (*People v. Jackson* (2009) 178 Cal.App.4th 590, 600.)

Defendant contends the evidence of premeditation and deliberation is insufficient to support the jury's finding of first degree murder. Defendant also contends that the evidence was insufficient to support the trial court's denial of his motion for acquittal, under Penal Code section 1118.1, at the close of the prosecution's case.

"In determining whether the evidence was sufficient either to sustain a conviction or to support the denial of a section 1118.1 motion, the standard of review is essentially the same. [Citation.] ' "[W]e do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence . . . . [Citation.] '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or reevaluate a witness's credibility." ' [Citations.] Notably, however, '[r]eview of the denial of a section 1118.1 motion made at the close of a prosecutor's case-in-chief focuses on the state of the evidence as it stood at that point.' [Citations.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1182-1183.)

"Murder is the unlawful killing of a human being with malice aforethought. [Citation.] Malice may be either express or implied. Express malice exists when there is a deliberate intention unlawfully to take away the life of a fellow creature. [Citation.] It is implied when no considerable provocation appears or when the circumstances attending the killing show an abandoned and malignant heart." (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1263.)

A murder which is "willful, deliberate, and premeditated," is murder of the first degree.  (Pen. Code, § 189.)  " 'By conjoining the words "willful, deliberate, and premeditated" in its definition and limitation of the character of killings falling within murder of the first degree the Legislature apparently emphasized its intention to require as an element of such crime *substantially more reflection* than may be involved in the mere formation of a specific intent to kill.'  [Citation.]"  (*People v. Boatman, supra,* 221 Cal.App.4th at p. 1264.)  Deliberation " ' "means careful consideration and examination of the reasons for and against a choice or measure."  [Citation.]' [Citation.]  Premeditation 'means "To think on, and revolve in the mind, beforehand; to contrive and design previously."  [Citation.]'  [Citation.]"  (*Ibid.*)  " ' "[T]he true test is not the duration of time as much as it is the extent of the reflection." '  [Citation.]" (*Ibid.*)

In considering whether circumstantial evidence is sufficient to support a finding of premeditation and deliberation, courts consider three factors first set forth in *People v. Anderson* (1968) 70 Cal.2d 15.  These factors are:  (1) planning activity; (2) motive; and (3) manner of killing.  Traditionally, courts uphold findings of first degree murder when there is evidence of all three types, or extremely strong evidence of type (1), or evidence of (2) combined with (1) or (3).  (*People v. Sanchez* (1995) 12 Cal.4th 1, 32.) However, the *Anderson* factors simply set forth guidelines for analysis; this is not a strict test.  (*Ibid.*)  If the *Anderson* factors are not present, a finding of premeditation and deliberation can still be upheld based on substantial evidence from which rational jurors could have found that the killing was the result of preexisting thought and the careful weighing of considerations.  (*People v. Boatman, supra,* 221 Cal.App.4th at p. 1270.)

We first consider the *Anderson* factors.  There is the greatest amount of evidence of the third factor: the manner of killing.  The manner of killing can constitute evidence of premeditation when the manner demonstrates "the particular and exacting execution of [a] helpless victim[]."  (*People v. Crandell* (1988) 46 Cal.3d 833, 868.)  Here, it appears that Matthews was lying on the bed, relaxing with her shoes off, when

defendant slashed her throat. That the cut was within the folds of Matthews's neck is evidence that defendant held her head up in order to expose her throat and make the cut. That defendant had small scratches on his left arm and knuckles is consistent with this view; if defendant held Matthews's head with his left hand and cut her with his right, it is only natural that Matthews would have scratched at defendant's arm to free herself. There is also some evidence of motive. A neighbor heard Matthews tell defendant to leave during an earlier fight; defendant told police Matthews had kicked him out on the night of the killing. If the jury believed this evidence, it could reasonably have concluded that defendant killed Matthews because she would no longer provide for him.

Moreover, other evidence may support a finding of premeditation, even when the *Anderson* factors have not been established. For example, evidence of the defendant's conduct *after* the killing may constitute evidence of premeditation.[13] Specifically, we can consider evidence "inconsistent with a state of mind that would have produced a rash, impulsive killing." (See *People v. Perez, supra,* 2 Cal.4th at p. 1128.) Here, defendant failed to obtain assistance for Matthews when she gasped for breath. Instead, he packed up his belongings, and contacted friends to try to find a place to stay. He stayed with friends that night, behaving normally, and went to a party the following night. This is evidence from which the jury could conclude that defendant's state of mind was not rash and impulsive but, instead, was cold and calculating.

Considering the evidence of two *Anderson* factors, as well as the evidence of defendant's behavior after the crime, we conclude that there was sufficient evidence to support the jury's finding of first degree premeditated murder. Consequently, defendant may be retried on that offense.

---

[13]     This could also be considered as part of the third *Anderson* factor. (*People v. Perez* (1992) 2 Cal.4th 1117, 1128.)

23

### DISPOSITION

The judgment is reversed and the matter remanded for further proceedings consistent with this opinion.  Because we reverse, in part, due to prosecutorial misconduct and ineffective assistance of defense counsel, a copy of this opinion will be sent to the State Bar.  (Bus. & Prof. Code, § 6086.7, subd. (a)(2).)


### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


LAVIN, J.[*]

WE CONCUR:



KITCHING, Acting P. J.



ALDRICH, J.

---

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.